Charles K. Sunwabe
1001 State Street, Suite 524
Erie, PA 16501
(814) 367-4313 | (814) 367-4312
sunwabelaw@gmail.com

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JELANI T. COOPER, | Case No.: |
| Plaintiff, | |
| vs. | JUDGE_____ |
| PENNSYLVANIA HUMAN RELATIONS | |
| COMMISSION, | JURY TRIAL DEMANDED |
| Defendant | |

## COMPLAINT

Plaintiff by and through his attorney, Charles K. Sunwabe, of The Law Offices of Charles K. Sunwabe brings this action against Defendant the Pennsylvania Human Relations Commission alleging as follows:

I.
### INTRODUCTION

1.     This action is brought to remedy violations of the Plaintiff's civil rights and to redress the unlawful and discriminatory conduct and employment practices of the Defendant, both directly and through the principle of respondent superior for the discriminatory actions of its commissioners, agents, directors, and employees.  This case stems from the illegal and retaliatory termination of Plaintiff, Jelani T. Cooper, Esq. ("Plaintiff") on April 9, 2019.

2.     Plaintiff alleges, *inter alia*, that he was discriminated against by the Pennsylvania Human Relations Commission ("Defendant" or "PHRC") based upon his race in violation of Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000(e) *et*. *seq*., and the Civil Rights Act of 1866, *as amended*, by the Civil Rights Restoration Act of 1991, 42 U.S.C. § 1981, and in retaliation for asserting his rights under Title VII.  Plaintiff asserts that Defendant directors, commissioners, and employees created and maintained a hostile working environment.

3.     Plaintiff also asserts a claim under Pennsylvania's State Whistleblower Law.  Pennsylvania's Whistleblower Law provides that an employee may not be discharged or discriminated against, in retaliation for opposing an unlawful discriminatory practice. *See* 43 P.S. 1421-1428.   The Pennsylvania Human Relations Act ("PHRA") makes it unlawful to discriminate or retaliate against an employee for making a charge of discrimination. Act of October 27, 1955, P.L. 744, as amended, 43 P.S. §§ 951-963.

4.     Plaintiff was the subject of continuous race discrimination affecting his ability to perform his job responsibilities.  In February 2016, Plaintiff filed a complaint with the Equal Employment Opportunity Commission's ("EEOC") alleging race, gender, and systematic discrimination.  Defendant agreed to mediate Plaintiff's EEOC complaint. On May 8, 2017, Defendant Commissioner Joel Bolstein ("Commissioner Bolstein") signed a mediation settlement agreement to form a PHRC Diversity Committee. Defendant failed to form a Diversity Committee as required by the EEOC agreement.

5.     Further, Defendant directors, managers, and employees continued a hostile working environment.  For almost five years Plaintiff was subject to disparate treatment, specifically, a Defendant senior manager stated, "they would fire him if they found out he was talking to black people about filing a complaint" and that "he is playing the race card."

6.      Plaintiff persistently attempted to get Defendant to comply with the EEOC agreement by calling and emailing commissioners.  When Plaintiff complained about Defendant's failure to comply with the EEOC settlement agreement, Defendant Executive Director Chad Dion Lassiter ("Mr. Lassiter") requested a search through his computer emails fishing for anything he could find to try to trump up charges against him.  Mr. Lassiter's decision to search Plaintiff's computer immediately after he complained about Defendant's failure to comply with the EEOC agreement is convincing evidence that he retaliated against him.  Plaintiff had no prior disciplines and was regularly called upon by the Pa. Department of Education and schools districts throughout the state to assist with discrimination issues.  The Philadelphia City Council passed a resolution on one of his cases, and even Philadelphia Mayor Jim Kenney tweeted about one of Plaintiff's cases stating, "discrimination has no place in our city."

## II.
## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this case pursuant to 28 U.S.C. §§ 1331 and 1334.

8.      Venue is proper in the United States Court for the Middle District of Pennsylvania pursuant to 42 U.S.C. § 2000(e)-(f)(3).

## III.
## ADMINISTRATIVE PREREQUISITES

9.      Plaintiff complied with all the administrative prerequisites to an action under 706 of Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000(e) *et*. *seq*., Plaintiff was provided a "Notice of Right to Sue" from the EEOC, dated October 1, 2019.

## IV.
## PARTIES

10.     Plaintiff is an African American male, who resides at 1139 Mulberry Street, Harrisburg, PA 17104, who at all times relevant to this Complaint was an employee within the meaning of Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000(e) *et. seq*. and appliable case law.

11.     PHRC is a government agency of the Commonwealth of Pennsylvania, existing under the laws of the Commonwealth of Pennsylvania, maintains offices in Pittsburgh and Philadelphia, and its headquarters at 333 Market Street, 8th Floor, Harrisburg, Dauphin County Pennsylvania 17101, and at all time relevant to this Complaint, was an employer within the meaning of Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000(e) *et. seq*., 42 U.S.C. § 12111(5), 43 P.S. § 954, 43 § 951 *et. seq*., and appliable case law.

## V.
## BACKGROUND INFORMATION

12.     PHRC is the state agency charged by the legislature with enforcing Pennsylvania's anti-discrimination laws, the PHRA and the Pennsylvania Fair Educational Opportunities Act ("PFEOA"), Act of July 17, 1961, P.L. 776, as amended, 24 P.S. §§ 5001-5010.  Plaintiff began his employment with PHRC in or around September 25, 2014, as an Attorney I in the Education and Community Services Division ("ECS").  Prior to joining PHRC, Plaintiff worked for several years as a special education teacher and a general law practitioner.  Plaintiff held bar memberships in Maryland, Pennsylvania, and the Eastern District of Pennsylvania.

13.     Plaintiff job duties included, *inter alia*, reviewing complaints, outreach, conducting diversity and cultural competency trainings, and litigating student and employee education complaints.

14.     Plaintiff conducted over 80 trainings and outreach events training employers, students, teachers, attorneys and community members throughout the

Commonwealth.  Plaintiff trained hundreds of students across the state.  Plaintiff conducted trainings on the PHRA and PFEOA, encouraged diverse work forces, and equitable and legal treatment of students and staff members.  Plaintiff conducted trainings with the Department of Justice ("DOJ"), the National Association for the Advancement of Colored People ("NAACP"), the Pa. Department of Education, and other community groups.  Plaintiff formed the first Advisory Council to the PHRC in Western Pa. and maintained two other councils (Blair County and Cambria County).

15.     Despite Defendant's hostile working conditions Plaintiff worked very hard as an attorney.  Plaintiff prevailed in the first public hearing held in Pittsburgh in seven years protecting the civil rights of two Jewish students.  Plaintiff settled the largest case in the history of the ECS and his settlements and relief totaled nearly five-hundred thousand dollars ($500,000).  Plaintiff prevailed in oral argument in front of a panel of three judges in the Commonwealth Court and in the Pennsylvania Supreme Court protecting the civil rights of thousands of Pennsylvania college students.

16.     Plaintiff often paid out-of-his pocket, without requesting reimbursement, for hotel accommodations and travel expenses when traveling for PHRC business.

17.     Plaintiff received outstanding employee reviews from his supervisors, praising him for his passion and commitment to the mission of the PHRC, working long hours, and his legal strategies. (See attached as Exhibit "A").

18.     Plaintiff also received letters of recommendation and thank you notes from complainants and witnesses of all races.  (See attached as Exhibit "A-1").  In December 2018, Plaintiff was awarded the "Legal Star" award, for being voted as the best PHRC attorney for the year and also the "Educations and Outreach" award.  Defendant's 2018 Annual Report provides: "**Education and Outreach Award – Jelani Cooper** Recognizing a PHRC employee whose training and outreach efforts have a profound impact on the lives of citizens of the Commonwealth.  **Legal Star Award – Jelani Cooper**  Recognizing an attorney who routinely goes the extra mile to serve his/her

assigned investigative/intake teams, is a role model for his/her commission-wide peers and works hard every day to bring justice to those who have been harmed by discrimination." (See attached as Exhibit "B").

19.     In or around 2011 former PHRC executive director Homer Floyd retired. Mr. Floyd was with the PHRC for approximately 40 years.

20.     Upon Mr. Floyd's retirement Defendant conducted a national search to fill the executive director position.

21.     In or around 2011, Defendant hired JoAnn Edwards ("Ms. Edwards"), Caucasian female, as executive director.

22.     Ms. Edwards had no previous work-related civil rights experience.

23.     Ms. Edwards was not an attorney.

24.     Ms. Edwards had no prior experience investigating civil rights complaints.

25.     Ms. Edwards had no prior experience supervising investigators or attorneys.

26.     Ms. Edwards has no prior experience interpreting laws and statutes, particularly anti-discrimination statutes.

27.     Despite Ms. Edwards lack of experience, Defendant commissioners determined Ms. Edwards was the most qualified candidate to lead Pennsylvania's State civil rights agency.

28.     Upon information and belief, 15 to 25 employee complaints of discrimination were filed against Defendant during Ms. Edwards time as executive director.

29.     Defendant was aware or should have been aware of these complaints of discrimination.

30.     On or about April 19, 2016, Governor Wolf ousted Commissioner Gerald Robinson ("Commissioner Robinson") from his position as Chairman.

31.     On April 19, 2016, the Philadelphia Inquirer reported that "[t]en current and former staffers have complained in recent weeks that the Commission had been quietly

gutted under Robinson, a Republican lawyer that Corbett appointed in 2011." The article also stated that "**staffers allege the commission – the target of at least three civil-rights lawsuits fosters some of the hostile working conditions and discriminatory hiring practices it is supposed to root out in the private sector**." *See*, https://www.inquirer.com/philly/news/politics/20160420_Wolf_ousts_head_of_Pa__Human_Relations_Commission.html. (Emphasis added).

33. The April 19, 2016, article also reported that "**10 current and former staffers spoke to the press on the condition they not be named for fear of retaliation or interference with their current jobs**." *Id.* (Emphasis added).

33. Despite these allegations, Commissioner Robinson and two other commissioners, Commissioner Joel Bolstein ("Commissioner Bolstein") and Commissioner Riquel Yiengst ("Commissioner Yiengst") were permitted to remain as Defendant commissioner.

34. In or about March 2019, the Harrisburg chapter of the NAACP called for the removal of Commissioner Robinson, Commissioner Bolstein, and Commissioner Yiengst. *See*, https://www.pennlive.com/news/2019/06/naacp-calls-for-removal-of-three-members-of-the-pa-human-relations-commission.html.

35. On or about April 1, 2019, the Pennsylvania Auditor General Eugene DePasquale joined the NAACP and called for the resignation of the commissioners, stating, "It's been nearly a year since a federal jury ruled in favor of a plaintiff who alleged that racial discrimination kept him from being hired as the commission's executive director in 2011," DePasquale also stated, "[s]everal individuals who are still serving on the commission were members during that debacle … [a]nyone found by a jury to have been a party to discrimination should not continue to serve on a commission that exists to fight bias," *See*, https://www.paauditor.gov/press-releases/auditor-general-depasquale-urges-resignations-at-pa-human-relations-commission.

**a.**
**Defendant's Disparate Treatment of**
**African American Employees**

36.     In 2015, Kevin Kaaba Brunson ("Mr. Brunson"), an African American

male, sued Defendant for race and sex discrimination when he was passed over for the

executive director position in favor of Ms. Edwards.

37.     In or about April 2018, Defendant was found liable by a federal jury for

race and sex discrimination for not hiring Mr. Brunson as the most qualified candidate.

Mr. Brunson received $150,000 for his race discrimination claim and Judge John E. Jones

awarded him $108,000 to cover his attorney fees.  *See*,

https://www.pennlive.com/news/2018/12/us-judge-gives-pa-60-days-to-pay-260k-race-

discrimination-judgment-against-human-relations-commission.html.  Mr. Brunson also

accused Defendant of unnecessarily calling the police on him.

38.     Between 2015 and 2016, Defendant's senior management staff consisted of,

Executive Director, Ms. Edwards, Special Assistant, Tammy McEflresh ("Ms.

McElfresh"), Harrisburg Regional Director, Heather Roth ("Ms. Roth"), Philadelphia

Acting Regional Director, Acting Pittsburgh Regional Director, Communications

Director, and Chief Counsel were all Caucasian females.  The three most senior attorneys

included two Caucasian females and one Caucasian male.  Defendant's administrative

law judge was also a Caucasian male.  Geoffrey Biringer ("Mr. Biringer"), Caucasian,

was hired for the Director of the ECS.  Commissioner Bolstein, Caucasian male, was

appointed chairman of the commission in October 2018.

39.     Ms. Edwards hired Ms. Roth for the Harrisburg Regional Director position

despite her not having any prior investigative, civil rights, or legal experience.

40.     Defendant employee, Jinada Rochelle ("Ms. Rochelle"), is a close ally of Ms. Roth and they are widely known throughout the three regions to collaborate and retaliate against employees.

41.     In 2016, Senator Anthony Williams held a public hearing ("Senator Williams") in which he asked Ms. Edwards how many employees reported directly to Ms. Edwards.  She replied "9 to 11".  When Senator Williams asked how many direct reports were "persons of color," Ms. McElfresh responded "zero."  Senator Williams stated that having no diversity on the senior management staff was not representative of the demographics of the state.

42.     Defendant alleged budget cuts were the reason for staff shortages.  The truth is that many employees were forced out, fired, or left because of Defendant's hostile working conditions.

### b.
### Plaintiff Receives Disparate Treatment

43.     At the time of Plaintiff's hire, he was the only African American male attorney.  Tom Zimmerman ("Mr. Zimmerman"), Caucasian, was hired approximately two weeks prior to Plaintiff.  Both Plaintiff and Mr. Zimmerman worked in the ECS.

44.     Approximately six months after Plaintiff's hire, PHRC hired Mr. Biringer, as director for the ECS.

45.     During Plaintiff's employment he was subject to race discrimination and a hostile work environment directed by Ms. Roth and Ms. Rochelle.

46.     Ms. Roth constantly required Plaintiff to attend meetings with Ms. Edwards and Ms. McElfresh to do discuss his legal work.  Ms. Roth did not directly contact Plaintiff or his supervisors if there was an issue, instead, she would immediately contact Ms. Edwards to call a meeting even for minor issues.

47.     On or about August 3, 2015, Ms. Roth informed Mr. Biringer that Plaintiff had been argumentative in meetings.  Staff under Ms. Roth's supervision stated that Plaintiff always acted with professionalism in meetings.

48.     Ms. Roth's complaints about Plaintiff resulted in him receiving negative employee reviews.

49.     Mr. Biringer was intimated by Ms. Roth because he knew that she was closely connected with Ms. Edwards and he feared being fired.  Ms. Edwards, Ms. McElfresh, and Ms. Roth were widely known to be hostile towards employees and instilled an atmosphere of fear and retaliation throughout the three regions.  One former employee informed Plaintiff that on one occasion Ms. McElfresh cursed her and threw something at her.

50.     From approximately October 2014 to December 2015, Ms. Roth required Plaintiff to attend at least six meetings even though Ms. Roth was not in Plaintiff's chain of command.

51.     Ms. Roth also required Plaintiff to attend a two-day training and discuss cases with PHRC Attorney Stephanie Chapman ("Ms. Chapman"), who is not in Plaintiff's chain of command. Mr. Zimmerman nor Mr. Biringer received training, but they were not required to attend trainings or discuss cases with Ms. Chapman.

52.     In the meetings Ms. Roth and Ms. McElfresh were often hostile towards Plaintiff, chastising him and criticizing him for mistakes made by investigators.  When Plaintiff explained that he was not provided information about what meetings were going to be about to be prepared, Ms. McElfresh mimicked wildly like she was writing on a piece of paper and said "what are we going to tell you, your work is sloppy".  Then looked at Plaintiff and asked "why are you getting defense."  After the meeting, Mr. Biringer stated that Ms. McElfresh was the only one that got excited.

53.     On one occasion Mr. Zimmerman forgot about a case on his docket for several months, however, Ms. Roth simply sent him an email reminding him.  She did not call a meeting with Ms. Edwards and Ms. McElfresh.

54.     The ECS quickly realized that a meeting invite from Mrs. Roth was to discuss something involving Plaintiff.  Ms. Roth would not provide any information she wanted to discuss in attempts to ambush Plaintiff in meetings.

55.     In or around August 2015, Plaintiff contacted former Commissioner Robison  to ask him for assistance in dealing with the harassment he was receiving.

56.     Commissioner Robinson told Plaintiff to go speak to Ms. Edwards, but warned him to be careful, stating, "they'll call the police on you."   Commissioner Robinson also referred to them as the "all white girls club."  When Plaintiff informed Commissioner Robinson of his intent to file a complaint he stated, "don't do that."

57.     In or around October 2015, Mr. Zimmerman left the Commission.  Plaintiff was the only PHRC education attorney responsible for covering the entire state.  During that same month, Plaintiff conducted and attended approximately six conferences and trainings throughout the state in addition to handling the education legal work.  Plaintiff often worked weekends and well into the evenings.

58.     At the end of October 2015, Ms. McElfresh met with Mr. Biringer and stated to him that Plaintiff "was not working hard enough."

59.     Plaintiff sought professional counseling and attended regular counseling sessions to deal with the stress and harassment at work.

60.     On December 15, 2015, Ms. McElfresh stated to Mr. Biringer in a meeting that "if [Plaintiff] is speaking to black people about filing a complaint, we will fire him." (See Mr. Biringer's affidavit attached as Exhibit "C").

61.     On January 7, 2016, Plaintiff emailed the commissioners and informed them that, "[t]he State leader in Civil Rights has a culture filled with discrimination, bullying, and bias."  (See email attached as Exhibit "D").

62.     The Commissioners never took any steps to address Plaintiff's complaints of bullying and harassment.

63.     Finally, on February 2, 2016, Plaintiff filed a complaint with the EEOC alleging race, gender, and systematic discrimination against Defendant.  The case was transferred to the New York State Division of Human Rights.  (See attached as Exhibit "E").

64.     Plaintiff's complaint did not stop Ms. Roth's harassment.

65.     In January 2017, Ms. Roth held a meeting with Ms. Edwards removed Plaintiff from reviewing education complaints.  Plaintiff reviewed education complaints for nearly three years and was not aware of this until a complainant telephoned him inquiring about their complaint.

66.     Plaintiff had to wait approximately two months before he met with Commissioner Bolstein to get his complainant review responsibilities reinstated.  Plaintiff shared with Commissioner Bolstein examples of some complaints written by investigative staff that were poorly written and included unnecessary information.  Commissioner Bolstein replied, "not only is it unnecessary but it's inflammatory [towards the complainant]."  Commissioner Bolstein also stated in front of Chief Counsel that "the Commission is dysfunctional."

67.     In or around July 2016, Plaintiff approached Commissioner Michael Hardiman ("Commissioner Hardiman") in the conference room and informed him of the hostile working environment.  Commissioner Hardiman stated, "I'm trying to figure out how to address it."  Commissioner Hardiman never made any recommendations or instituted programs to address the hostile working environment.

68.     In or around 2017, Defendant hired Deborah Vereen ("Ms. Vereen"), of "The Vereen Group", to conduct employee cultural climate surveys.  According to Ms. Vereen, she informed the Commissioners and executive staff that it "had major

problems" regarding the PHRC's culture.  Despite Ms. Vereen's warnings, Defendant did not institute any programs to address the cultural climate.

**c**.
**Plaintiff's EEOC Mediation**

69.     On May 8, 2017, Plaintiff attended an EEOC mediation.  In attendance was Plaintiff, Commissioner Bolstein, PHRC Attorney Martin Cunningham ("Mr. Cunningham"), EEOC Mediator Ralph Charles ("Mr. Charles") and an attorney from the Pa. Attorney General's Office ("AG").  Plaintiff's only request was for Defendant to form a Diversity Committee to settle the complaint.  The attorney from the AG's office was surprised that PHRC did not already have a diversity committee.  Plaintiff requested to establish a Diversity Committee to improve the cultural climate of the PHRC and to include more trainings for investigators.  On April 28, 2018, NBC Philadelphia reported that the average case time for complainants (once it reached an investigator) is 500 days; in 2017 Defendant received 3,200 complaints in which 60 were found to have cause (less than 2 percent).  *See* https://www.nbcphiladelphia.com/news/local/thousands-complaints-long-waits-few-answers-pennsylvania-human-relations-commission/55915/.

70.     Commissioner Bolstein agreed, to the Diversity Committee, stated, "it's a great idea" and signed the EEOC settlement agreement ("Agreement").  (See attached as Exhibit "F").  By signing the Agreement, Plaintiff relinquished his rights to an EEOC investigation into his complaints of race and gender discrimination.

71.     After two conference calls, Commissioner Bolstein disregarded emails from Plaintiff to hold Diversity Committee meetings.

72.     At the same time Commissioner Bolstein failed to implement the Diversity Committee, he pushed for a "Crisis Protocol Committee" ("CPC") in the event a "race riot" broke out somewhere in Pennsylvania.  At Commissioner Bolstein's direction,

Defendant staff was required to promptly create the CPC and regularly held CPC meetings.  PHRC staff are not trained to address issues of riots or other such incidences.

73.    Defendant has several other committees that meet regularly and Commissioner Bolstein is in regularly attendance.  Commissioner Bolstein also leads the monthly commission meeting in Harrisburg.

74.    Commissioner Bolstein did not participate in or advocate for regular Diversity Committee meetings.

### d.
### Defendant Hires Chad Lassiter

75.    In or about January 2018, Defendant Commissioners fired Ms. Edwards.

76.    Defendant commissioners began a national search to fill the executive director position.

77.    In or about May 2018, Defendant hired Mr. Lassiter, an African American male for the executive director position.  Mr. Lassiter came from West Chester University as a professor of social work.

78.    Mr. Lassiter possesses a master's degree in social work.

79.    Defendant's executive director position is responsible for, *inter alia*, overseeing three regional offices and the Central Office in Harrisburg, all PHRC investigators, attorneys, chief legal counsel, an administrative law judge, approving complaints for public hearing, and interpreting the PHRA, and PFEOA.

80.    Mr. Lassiter had no previous experience investigating civil rights complaints.

81.    Mr. Lassiter had no previous experience drafting civil rights complaints.

82.    Mr. Lassiter had no previous experience drafting legal briefs or making legal recommendations.

83.     Mr. Lassiter had no previous experience supervising attorneys or investigators.

84.     Mr. Lassiter had no previous experience interpreting anti-civil rights laws and statutes.

85.     Upon Mr. Lassiter's arrival he was not provided any training on constructing complaints or interpreting the PHRA or PFEOA.

86.     At least one African American female PHRC employee with 18 years of experience applied for the executive director position.

87.     The African American female employee interviewed for the executive director position.

88.     Defendant hired Mr. Lassiter in favor of the African American female employee.

89.     Like Ms. Edwards hire, commissioners Bolstein, Robinson, and Yiengst were commissioners at the time Mr. Lassiter was hired.

90.     Commissioner terms are generally for five years.

91.     Commissioner Bolstein has been a Commissioner for nearly 20 years.

92.     Commission Robinson for more than 10 years.

93.     Commissioner Yiengst has been a commissioner since 1978.

94.     Defendant commissioners hired consecutive executive directors with no previous work-related civil rights experience.

95.     Commissioners Robinson, Bolstein, Yiengst, and Hardiman are significantly more experienced with interpreting the PHRA than Mr. Lassiter.

96.     Initially, employees were eager to support Mr. Lassiter welcoming the change in leadership.

97.     Mr. Lassiter quickly learned that the commissioners were going to allow him to do whatever he wanted as long it was a quid pro quo.

98.     Commissioners approve Mr. Lassiter's out-of-town travel and even out-of-state travel when it does not concern PHRC business.  Mr. Lassiter at various times has traveled to Virginia and Charlotte North Carolina for personal speaking events funded by Pa taxpayers.

99.     Mr. Lassiter's first four hires as executive director were four Caucasian employees.

100.    Mr. Lassiter hired Renee Martin, a Caucasian female, as the communications director. Mr. Lassiter hired a Caucasian female, as the mediation coordinator.  Mr. Lassiter hired Devin Heckman, Caucasian male, as an administrative assistant.  Mr. Lassiter hired a Caucasian male to work in the outreach division.  None of Mr. Lassiter's hires had any previous work-related civil rights experience.

101.    Mr. Lassiter also informed Plaintiff that he wanted to find a Hispanic person for the Philadelphia Regional Director position, even though it was currently occupied by an African American female.  Mr. Lassiter explained he wanted to have a Hispanic that could go into the Hispanic neighborhoods.

102.     Mr. Lassiter has required African American female employees to decorate the Central Office and hang pictures on the wall.  Mr. Lassiter does not require Caucasian females to decorate the offices.

### e.
### Mr. Lassiter Attempts to Retaliate Against Ms. Roth

103.    Upon Mr. Lassiter's arrival he informed Plaintiff that he wanted to fire Ms. Roth because he heard that she believed "he was racist towards white people" based upon his social media posts.

104.    Mr. Lassiter asked Plaintiff to find out if Ms. Roth's job position was union to determine whether she could be fired.  Mr. Lassiter also requested from Plaintiff and

other employees to gather and provide him with any negative information regarding Ms. Roth.

105.    According to Mr. Lassiter, HR informed him that he could not fire Ms. Roth because she had not done anything wrong since he became executive director.

106.    Mr. Lassiter also informed Plaintiff that he was going to fire Ms. Rochelle, stating "I'm getting her out of here."

**f.**
**Defendant Fails to Institute a Diversity Committee**

107.    In or about June 28, 2018, Plaintiff met with Mr. Lassiter to share with him the work of the ECS and the hostile history of PHRC.  Plaintiff compiled a full binder for Mr. Lassiter involving all of the ECS work.

108.    In the June 28th meeting Plaintiff also informed Mr. Lassiter of the EEOC Agreement and the Diversity Committee that had not been formed.

109.    In that same meeting Mr. Lassiter stated that Commissioner Robinson regularly used the "N-word," and that he told Commissioner Robinson not to use the word around him.  In or around 2014, while attending a presentation at Millersville University, Commissioner Robinson also used the N-word in front of Plaintiff and Mr. Zimmerman.

110.    While Defendant would not support a PHRC Diversity Committee Defendant commissioners aggressively enforces a diversity agreement against the Reading School District ("RSD"), mandating more than 100 terms.  The RSD agreement includes such terms as hiring a diversity coordinator, monitoring hiring of minority employees, and training employees on diversity.  RSD initially hired Lucretia Brown, an African American woman for the diversity coordinator position.

111.    Defendant reported spending over $500,000, and counting, to enforce the diversity agreement with RSD.

112.    Commissioner Robinson is originally from Reading, Pa., and Commissioner Yeingst worked for RSD for 35 years.  *See*, https://www.phrc.pa.gov/About-Us/Commissioners/Pages/Dr-Raquel-O-Yiengst-Vice-Chairperson-.aspx.  Additionally, Commissioner Bolstein's law firm, Fox Rothschild, represents RSD.

113.    Defendant contracted and paid an outside Attorney David Berney ("Attorney Berney") $150 an hour to work on the RSD agreement. (See attached as Exhibit "H").  PHRC paid Attorney Berney nearly $80,000.  Attorney Berney's work on the RSD agreement did not result in a final resolution to the agreement.

114.    PHRC attorneys including Mr. Zimmerman, Plaintiff, Mr. Cunningham, Mr. Biringer, and Chief Counsel were also required to work on the RSD agreement with Attorney Berney.  Legal staff believed that anyone that challenged the commissioners on the RSD agreement could be retaliated against.

115.    Defendant also hired a language expert Dr. Helaine Marshall ("Dr. Marshall") to work on the RSD agreement.

116.    Previous PHRC attorneys wrote memos disagreeing with the commissioners' approach to RSD and them forcing out Lucretia Brown from her position of diversity coordinator at RSD.  At least one of the attorneys left after the commissioners scolded him.  Commissioners Robinson and Yiengst preferred a Hispanic person for the diversity coordinator position.

117.     At the same time Attorney Berney was paid nearly $80,000 dollars, Defendant claimed to Senator Williams that its budget had been cut.

118.    Conversely, Plaintiff monitored a similar diversity agreement with the Pittsburgh Public School District ("PPSD").  Defendant did not expend any funds in enforcing the PPSD agreement or provide Plaintiff any support.  Defendant had an agreement with another school district in which it let completely lapse without any monitoring.

119.    In June 2018, Mr. Lassiter created a Social Justice Lecture Series in which he paid $10,000 to Tim Wise for him to come to speak to PHRC staff for a couple of hours.

120.    Mr. Lassiter also paid Michael Eric Dyson $30,000 to speak to a crowd of about 75 people in Pittsburgh. Mr. Lassiter pays these public speakers to associate himself with them.  Mr. Lassiter has also held at least 5 "town hall" meetings since his hire.

121.    Prior to Mr. Lassiter's hire, in 2018, Plaintiff and another staffer collaborated to host a Black History program, a Women's History program, and an LGBT program for staff.  Each program brought in diverse guest speakers, including the Secretary of Health Dr. Rachel Levine.  Plaintiff and the other staffer funded the programs themselves.  The programs were not a part of any planned or approved diversity committee.

122.    In 2019, Mr. Lassiter did not host a Black History program, Women's History Program, or LGBT program.

123.    On July 17, 2019, Mr. Lassiter responded with hostility to an employee's request to have a meeting writing in an email, "I'm the agency head and you don't have to inform me what to do.  I've already spoken and this will be escalated beyond the Union**. I'm not your colleague even if you meant this in the spirit of unity."**  (See attached as Exhibit "I") (Emphasis added).

124.    President of the SEIU Local 668, Steve Catenese, emailed Mr. Lassiter stating:

> …Your emails aren't what deals with the systematic issues at PHRC, it's their hard work.  They do not deserve to be treated disrespectfully like this by anyone, let alone their employer. Our members have a legal right to meet and discuss issues with your office at their request.  No one in a 'higher office' can stop that from happening.  Whether you choose to constructively

engage in discussion or fall back into this needlessly hostile pattern will be your prerogative.

That you took this email as an opportunity to attack your own Communications Director at the same time as you insulted our members is indicative of a complete lack of professionalism and no self-awareness, two qualities that define your entire diatribe. I suggest, before putting fingers to keyboard on another email, you look inward and reflect upon what you can do better as a leader. True leaders lift people up, not push them down. True leaders need people willing to follow them. Self-defining what you are doing as 'leadership' does not mean it is what you are practicing. Why would anyone follow someone who treats them like this?

(See email attached as Exhibit "J").

125.    On June 12, 2017, Plaintiff emailed EEOC mediator Mr. Charles and informed him that Defendant was not complying with the Agreement. (See attached as Exhibits "G-1").

126.    On December 18, 2017, Plaintiff emailed Commissioners Hardiman, Commissioner Bolstein, Commissioner Jones, and Mr. Cunningham stating, "I have not been able to receive return emails or phone calls from Commissioners regarding the Committee. I need to be informed if there is an intention to maintain the Committee." (See attached as Exhibits "G-2"). Plaintiff received no response.

127.    On June 28, 2018, Plaintiff looking forward to finally getting the Diversity Committee together, emailed Mr. Lassiter providing him the EEOC settlement agreement and letting him know that, "[t]he [PHRC] has not upheld its terms of the agreement." (See attached as Exhibit "G-3").

128.    On February 8, 2019, Defendant finally scheduled a Diversity Committee meeting. The email invite provides, "First meeting need to discuss details." The meeting included Plaintiff, Commissioner's Hardiman, Mr. Lassiter, Anja Velimir and Commissioner Bolstein was on the phone. (See attached as Exhibit "G-4").

20

129.   In the meeting Plaintiff suggested that a current PHRC employee be selected to be a chairperson to head the Committee.

130.   Mr. Lassiter responded, "we have more important things to do, maybe in 2024 or something."  The meeting then abruptly ended after about 10 minutes.

131.   About a week after the February 8, 2019 meeting, Mr. Lassiter reluctantly met with Plaintiff stating he had only a few minutes because he was in budget meetings all day.  Plaintiff informed Mr. Lassiter that PHRC was in breach of the Agreement.  Mr. Lassiter stated, "I ain't in breach of nothing."  Plaintiff informed Mr. Lassiter that he was going to contact the EEOC to enforce the agreement.

132.   On February 14, 2019, Plaintiff emailed Commissioner Hardiman requesting to speak with him explaining that Ms. Roth and Ms. Rochelle constantly harassed him.  Complainant received no response from Commissioner Hardiman. (See attached as Exhibits "G-5").

133.   On February 16, 2019, Plaintiff emailed Commissioner Bolstein requesting to speak with him regarding the Diversity Committee.  (See attached as Exhibit "G-6").

134.   On February 17, 2019, Mr. Lassiter emailed Plaintiff stating:

> Jelani, Thanks for reaching out to Joel about the Diveristy [*sic*] Comittee [*sic*].   My professional expectation is that next time you include me as the agency head so that I'm not professionally blindsided. I hope we are clear moving forward. Joel is working to find out what seems to be the challenge in meeting the agreement etc. Chad

135.   On February 19, 2019, Commissioner Bolstein emailed Plaintiff:

> I'm following up by checking into the status of the Diversity Committee. I know we had meetings scheduled for December, **but they had to be canceled because one or more Commissioners were ill or unavailable.**   After I received your email, I reached out to Chad to get additional information.  As ED, Chad is

> responsible for the day to day management of the
> Commission, which would include the work of the
> Diversity Committee, and I don't want to do anything
> that blindsides Chad or usurps his authority.

(See attached as Exhibits "G-7") (Emphasis added).

136.   In 2017, several Diversity Committee meetings were cancelled.  (See attached as Exhibits "G, 8-9").  The agency that's charged with promoting diversity in Pennsylvania had no interest in having a diversity committee.  After nearly two years, Commissioner Bolstein claims he was still trying to figure out how to hold a Diversity Committee meeting.  Over the same time period Commissioner Bolstein attended and organized numerous meetings.

137.   On February 20, 2019, Plaintiff emailed Commissioner Curtis Jones and requested to get on his schedule for a phone call "ASAP".  Plaintiff received no reply from Commissioner Jones. (See attached as Exhibit "G-10")

138.   On or about February 20, 2019, Plaintiff sent an email to several community members requesting help to form a Diversity Committee and his thwarted efforts to form a Diversity Committee.  (See attached as Exhibit "K").

139.   On February 23, 2019, Mr. Lassiter emailed Plaintiff stating, *in part*,:

> I'm [*sic*] Dear Jelani,
>
> You have an agenda and I'm not going to be drawn into it. … In 8 months we have advanced the Commission and you Jelani will not tear that down because of your issues and agenda.  **You are not more powerful than God**.  The ethos has changed and we will continue to respect everyone and honor all agreements including the Diversity one.  For those of you reading this Mr. Cooper is hurting and he is lashing out.  He is respected by me but the bullying tactics in which he is attempting to be heard will not work with me.  I'm not anything similar to those in the past who hurt Mr. Cooper.  I'm a consensus builder in the spirit of Dr. King and Rabbi Heschel.

We have launched the PHRC Social Justice Lecture Series with Tim Wise, Michael Eric Dyson and have scheduled Cornell West, Jane Elliot, Taranya [*sic*] Burke of #metoo.  I inherited Mr. Cooper's pain and the pain of at least 20 others who have met with me and shared with me the pain of the past that for me was real.  Many are still wounded and I bare their pain and I have worked with many on how to become 'wounded healers' but more work is needed.  I have also inherited the pain of the PHRC Commissioners who were done wrong by many of the staff and were lied on by many of the staff.  Their pain too is real. Mr. Cooper wants me to dislike those PHRC Commissioners that he has had conflict with.  I refuse to that and this upsets Mr. Cooper.  Mr. Cooper is combative and he wants to be the leader of PHRC but the data speaks to the mere fact that he never applied for the position and was not even being considered.  Mr. Cooper needs to be very careful with the narratives that he and those who are colliding [*sic*] with him are putting out with regards to his claims that 'there are no Civil rights people around me.'  I've only made 3 hires since I have been at PHRC and as stated before I inherited everyone including Mr. Cooper.  I am praying for Jelani Cooper and I hope he heals and if anyone wants the truth and not the untruths that he and Kabba [*sic*] Brunson spread I am always available to speak that truth.

I pray for the NAACP, the PA Black Caucus and my PHRC Commissioners and daily in prayer for the Commonwealth.  I'm not afraid of anyone but God and I am asking Mr. Cooper to get the help he needs because I need his intellectual property to address the Shadow of Hate that permeates our democracy. Best, Chad

(See full email attached as Exhibit "L") (emphasis added).

140.    Plaintiff considered Mr. Lassiter's email hostile and inappropriate and forwarded it to a staffer in Senator Williams office and lightheartedly referred to it as "unhinged."

141.    In February 2019, Plaintiff called Charles Phillips from the DOJ informing him of the discriminatory actions of Defendant and requesting help to mediate the Agreement with PHRC.

142.    By letter dated March 1, 2019, Plaintiff emailed and mailed Mr. Charles and John Waldinger, Newark Area Director of the EEOC, informing them that Defendant had not complied with the Agreement to form a Diversity Committee. (See attached as Exhibit "G-11").

143.    In or about March 2019, Mr. Lassiter fired Chief Counsel Kathy Morrison without warning merely stating to her, "today is your last day."

144.    Mr. Lassiter fired Chief Counsel without any plan or thought of transferring her cases to anyone putting complainants at a disadvantage and creating additional work for a small staff of attorneys.

**h**.
**Defendant Investigates Plaintiff**

145.    On or about March 25, 2019, Mr. Cunningham informed Plaintiff that he was requested at a meeting that afternoon.  Plaintiff was given a building and room number but no other information.

146.    Plaintiff met with the Chief Employee Relations, Matthew Updegrove ("Mr. Updegrove"), and he inquired about the email Plaintiff sent on February 20th.  Mr. Updegrove asked Plaintiff if he believed Mr. Lassiter was unhinged.  Mr. Updegrove questioned Plaintiff about whether he believed the email made the PHRC "look bad?" Plaintiff informed Mr. Updegrove that the information about PHRC was all factual information, it had not complied with the EEOC Agreement.  Mr. Updegrove also asked about several other emails Plaintiff sent to his personal email from his work email that were draft complaints (to work at home in the evenings and weekends).

147.    Plaintiff informed Mr. Updegrove that there was a lot of bullying and hostile treatment at PHRC.   Mr. Updegrove began placing emails in front of Plaintiff dating back several months and inquired about them trying to find an email he could use against him.

148.    Mr. Updegrove asked Plaintiff "what if your email was hacked?"

149.    One email was a picture of a model sent from Plaintiff's phone to his work email, "jelcooper@pa.gov".  The email unintentionally populated to Plaintiff's personal email "jelanicooper@gmail.com".   The mod el was clothed and no one else saw the picture, however, Defendant claimed it was "sexually suggestive."

150.    On March 29, Plaintiff emailed and mailed to Mr. Updegrove a full narrative documenting the hostile treatment he received over the years.  (See attached as Exhibits "G-12").  Mr. Updegrove showed no concern about Plaintiff's complaints of a hostile working environment and retaliation.

151.    On or about April 1, 2019, Plaintiff filed a retaliation complaint with the EEOC.

152.    On April 9, 2019, Plaintiff was called into a meeting with Mr. Lassiter and Mr. Updegrove.  Mr. Updegrove stated that "we made the decision to terminate you because of the things you said about the director."  Mr Updegrove stated that, "you can get a few things but the rest of your things will be mailed to you."  Mr. Updegrove required Plaintiff to turn in his badge then escorted Plaintiff out the building.  Mr. Lassiter did not want employees to see Plaintiff getting fired because he knew that he was well liked by colleagues.

153.    Plaintiff was not provided any type of hearing or meeting.  Plaintiff was not afforded any type of appeal process.

154.    Mr. Lassiter did not consult with Mr. Cunningham to determine if he should fire Plaintiff.

155.   Plaintiff still has not received his personal belongings including his law books.

156.   At the time of Plaintiff's termination he was PHRC's longest tenured African American attorney. Plaintiff had never received a prior discipline.

157.   Prior to his termination, Plaintiff was only one week away from his meeting with HR for his promotion to Attorney III.  Mr. Biringer had just written complainant a recommendation to be promoted to Attorney III.

## COUNT I
## EMPLOYMENT RACE – DISCRIMINATION
## HOSTILE WORK ENVIRONMENT

158.   Paragraphs 1 through 157 are incorporated by reference as if set forth at length.

159.   Title VII of the Civil Rights Amendment, 42 U.S.C. § 2000 (e) *et*. s*eq.,* provides it is unlawful for an employer to discriminate against an employee because of his/her race.

160.   Plaintiff is an African American male, who during his employment with Defendant was a member of a protected class under Title VII against race-based discrimination by Defendant and all of its agents, directors and employees.

161.   At all times relevant to this complaint, Defendant governed and controlled all matters regarding Plaintiff's compensation, terms, rights and privileges.

162.   At all times relevant to this complaint, Defendant was responsible for the acts omissions of the individuals it employed, who acted as commissioners, chairpersons, directors, agents and/or employees of Defendant.

163.   At all times relevant to this Complaint, Plaintiff performed the duties of his position with integrity, competency, and completely performed all of the functions and responsibilities of his employment with Defendant.

164.    Defendant intentionally and maliciously discriminated against Plaintiff because of his race.

165.    Defendant subjected Plaintiff to disparate treatment and singled him out because of his race by making him attend trainings and discuss cases Caucasian attorneys were not required to do.

166.    Defendant's discriminatory conduct was pervasive and severe.

167.    Defendant's hostile behavior negatively affected Plaintiff's ability to perform his job duties and psychological and emotional health.

168.    Defendant's conduct would have detrimentally affected the reasonable person of Plaintiff's same race.

WHEREFORE, Plaintiff seeks back pay, front pay, interest, compensatory damages, including emotional distress, inconvenience, mental anguish and loss of enjoyment of life, attorney's fees, reimbursement for the cost of filing the Complaint and litigation cost, and delay damages.

**COUNT II**
**RETAILATION**
**TITLE VII**

169.    Paragraphs 1 through 168 are incorporated by reference as if set forth at length.

170.    Title VII provides that it is unlawful to retaliate against Plaintiff for exercising his rights under Title VII.

171.    To prove a case of retaliation Plaintiff must show that an employer took a material adverse action because an employee asserted rights protected by the EEO.

172.    Plaintiff can show retaliation by showing:

1) Plaintiff engaged in prior activity;

2) the employer took a material adverse action; and

3) Retaliation caused the employers action.

(See EEOC Guidance https://www.eeoc.gov/laws/guidance/retaliation-guidance.cfm).

173.    In this case, Plaintiff meets the first element because Plaintiff filed a race discrimination complaint against Defendant on February 2, 2016.

174.    On May 8, 2017, Commissioner Bolstein signed the EEOC mediation Agreement.

175.    Defendant failed to comply with the terms of the EEOC agreement and continued a hostile working environment.

176.    On February 20, 2019, Plaintiff sent an email to community members to get help to form a Diversity Committee.

177.    Immediately after the February 20 the email, Defendant began to search through Plaintiff's computer. Plaintiff's email was Mr. Lassiter's motivating factor to have his computer searched.  Further, Plaintiff's termination letter was signed by "Chad Dion Lassiter" not HR (See attached as Exhibit "M").

178.    Plaintiff's complaints of Defendant not complying with the EEOC Agreement was the direct and proximate cause of his termination.


WHEREFORE, Plaintiff seeks back pay, front pay, interest, compensatory damages, including emotional distress, inconvenience, mental anguish and loss of enjoyment of life, attorney's fees, reimbursement for the cost of filing the Complaint and litigation cost, and delay damages.


**COUNT III**
**WHISTLEBLOWER**
**PHRA**
**RETAILATION**

179.    Paragraphs 1 through 178 are incorporated by reference as if set forth in full.

180.    Pennsylvania's Whistleblower Law protects employees from retaliation.

181.    Pennsylvania's Whistleblower provides that an employee cannot be discriminated or retaliated against for making a good faith report of wrongdoing.   Act of Dec. 12, 1986, P.L. 1559, No. 169182.

182.    The PHRA provides that it shall be unlawful to take an adverse action against an employee for engaging in protected activity.  PHRA, 43 P.S. Section 955(a).

183.    Plaintiff became a Whistleblower, and exposed Defendant's failure to comply with the Agreement.

184.     Defendant's conduct to investigate and terminate Plaintiff for making a good faith complaint violates Pennsylvania's Whistleblower Law and the PHRA's retaliation provisions.


WHEREFORE, Plaintiff seeks back pay, front pay, interest, compensatory damages, including emotional distress, inconvenience, mental anguish and loss of enjoyment of life, attorney's fees, reimbursement for the cost of filing the Complaint and litigation cost, and delay damages.

# VI.
## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays judgement against Defendant as hereinafter set fourth:

1. For back pay and future pay in an amount according to proof;
2. For compensatory and general damages in an amount according to proof;
3. For loss of past and future benefits in an amount according to proof;
4. For damages sustained as a result of emotional distress, including damages for noneconomic losses, including but not limited to, embarrassment, humiliation, and loss of enjoyment of life;
5. For pre- and post-judgement interest on all damages allowed by the law;
6. For cost of suit occurred herein;
7. For attorney fees under existing law;
8. Delay damages, including, but not limited to, Defendants delay in complying with discover requests and in general moving forward with litigation in a timely manner;
9.  Interest; and
10. For such other and further relief as the Court shall deem just and proper;

Dated: December 30, 2019

s/Charles K. Sunwabe
_____
Charles K. Sunwabe
Pa. ID 313368
Law Offices of Charls K. Sunwabe
1001 State Street, Suite 524
(814) 367-4313

## **VERIFICATION**

The foregoing document is based upon information gathered by my counsel in preparation for litigation.  I have read the document and based upon information I have provided my counsel it is true to the best of my knowledge information and belief.

I verify that the facts set forth in the foregoing document are true and correct.  I understand that false statements herein are subject to the penalties of 28 U.S.C. Section 1746 and 18 Pa. C.S.A. relating to unsworn falsification to authorities.

Dated: December 30, 2019

s/ Jelani T Cooper_____
                Jelani T. Cooper