# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JELANI T. COOPER,** | : | **Civil No. 1:19-CV-2230** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **PENNSYLVANIA HUMAN** | : | |
| **RELATIONS COMMISSION** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

## I.   Introduction

This is an unusual case in many respects. First, this case involves an unusual constellation of parties in that the defendant in this workplace discrimination lawsuit is the Pennsylvania Human Relations Commission (PHRC), the state agency charged with enforcing state laws forbidding workplace discrimination. The case also has an unusual and convoluted procedural history which involves longstanding acrimony, claims of discrimination, the settlement of those claims by the EEOC, and then renewed claims of retaliation and discrimination, many of which deeply implicated the prior, settled dispute. In an unusual move, we are then invited to vitiate the settlement agreement negotiated under the aegis of the EEOC and conflate these previously settled claim with Cooper's new allegations without first allowing

that agency to make any determinations regarding whether there has, in fact, been a breach of this settlement agreement.

This workplace discrimination case, which has been lodged against the Pennsylvania Human Relations Commission (PHRC) by an attorney formerly employed by that agency, comes before us for consideration of a motion for summary judgment. The plaintiff, Jelani Cooper, brings this lawsuit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e),$and Pennsylvania's Whistleblower Law, 43 P.S. §§ 1421-28. In his complaint Cooper asserts that his former employer, the Pennsylvania Human Relations Commission ("PHRC") engaged in a campaign of race-based discrimination that led to a hostile work environment throughout his tenure with the organization. According to Cooper, the hostile work environment based on race discrimination started in 2016 and continued through the administrations of two executive directors, culminating in his allegedly retaliatory firing in 2019 by the current PHRC executive director, Chad Dion Lassiter. Cooper's race discrimination claims were previously raised with the EEOC and settled pursuant to an agreement that PHRC create a diversity committee ("the settlement agreement"). Much of Mr. Cooper's instant complaint concerns the alleged failure of PHRC to comply with, and Mr. Cooper's persistence in holding PHRC to the terms of, the settlement agreement.

Mr. Cooper's complaint is extensive in its recounting of numerous workplace disagreements, hard feelings, and animosity. The complaint's claims also present a study in contrasts. For example, Cooper's retaliation claim entails a straightforward, albeit, contested narrative regarding  what the plaintiff describes as a pattern of retaliation against him when he endeavored to enforcement his prior settlement agreement with that agency. In stark contrast to the relative clarity of this retaliation claim, Cooper's hostile workplace discrimination claim appears to conflate and combine his past, settled grievances with his new complaints that sound in retaliation. Thus, an essential component to this discrimination claim, which seeks to resurrect Cooper's prior settled disputes with the PHRC,  would be a finding that there was a breach of this prior settlement agreement. No such finding has been presented to us by the parties, and as we discuss below, we believe that it would be inappropriate for us to assess, interpret, or vitiate a pre-decisional settlement agreement brokered and overseen by the EEOC.

In parsing through his sweeping approach to his claims, we find the plaintiff's conflated discrimination and hostile work environment claim under Title VII and his Pennsylvania Whistleblower claim run afoul of several legal hurdles. First, to the extent that they invite us to make finding that would essentially set aside the settled negotiated under the aegis of the EEOC, we should decline to do so. In addition, once the previously settled discrimination claims are stripped from this lawsuit, what

remains is a claim that sounds in retaliation, and not race-based hostile workplace discrimination. Further, some of these claims are procedurally barred on a number of grounds. In particular, we find that Cooper's state whistleblower law claim is time-barred.

However, as to Cooper's claim for retaliation under Title VII, we find that there exists an outstanding question of material fact for the jury as to whether Cooper's discipline and firing was in retaliation for his pursuit of his EEOC claim and demand that PHRC comply with what Cooper understood to be the terms of the settlement agreement. These questions of motive and motivation cannot be determined as a matter of law. Rather, they must be resolved as questions of fact. Accordingly, the defendant's motion for summary judgment, (Doc. 28), shall be granted in part and denied in part in that we will grant summary judgment on the discrimination claim, and Cooper's state law whistleblower claim, but deny summary judgment on Cooper's retaliation claim. [1]

---

[1] As we turn to consideration of this motion, we note that the defendant has raised the issue of the plaintiff's compliance with Local Rule 56.1 in his submission of a counter statement of material facts in opposition to the motion for summary judgment. Local Rule 56.1 directs the party opposing a motion for summary judgment to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue to be tried." If the nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted." L.R. 56.1. The local rules further affix the burden imposed by Federal Rule of Civil Procedure 56(e) on the nonmoving party "to go beyond the pleadings and by her own affidavits, or by the depositions,

## II.   Statement and Facts of the Case

### A. Cooper's Employment by the PHRC

The plaintiff worked for the PHRC, a state agency charged with enforcing Pennsylvania's anti-discrimination laws, from 2014 until his termination in 2019. (Doc. 1, ¶¶ 12, 152). During that time, he worked as an attorney in the Education and Community Services Division ("ECS") and his duties consisted of reviewing complaints, outreach, conducting diversity and cultural competency trainings, and litigating student and employee education complaints. (Doc. 1, ¶¶ 12-13). Cooper's complaint highlights his successes and accolades from his time with PHRC, including letters of recommendation and thank you notes from clients and witnesses,

---

answers to interrogatories, and admissions on file, designated specific facts showing that there is a genuine issue for trial.'" Doe v. Winter, No. 04–CV–2170, 2007 U.S. Dist. LEXIS 25517, *2 n. 2, 2007 WL 1074206 (M.D.Pa. Apr. 5, 2007) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)). It appears the plaintiff presented his counter statement of facts in narrative form rather than directly addressing the numbered paragraphs set forth in the defendant's statement of material facts. Further, the plaintiff's counter statement of facts failed to go beyond the pleadings in support of its allegations, merely citing to the original complaint for each averment. Thus, defendant asks this Court, in accordance with Local Rule 56.1, to deem admitted all material facts set forth in the defendant's statement of material facts. Although we acknowledge the plaintiff did not precisely follow our practice rule, we nonetheless conducted a thorough, independent review of the record, and have supplemented the factual background where certain facts are not included in the statement but are relevant to the case, particularly where the plaintiff's brief and counter statement of facts, read as a whole, make it clear that there is a disputed issue of fact which are not entirely resolved by the defendant's motion.

awards for his training and outreach efforts, and outstanding employee reviews from his supervisors. (Id., ¶¶ 17-18). He also notes that, prior to his termination in 2019, he had never received a disciplinary report, was the PHRC's longest tenured African American attorney, and was only one week away from a recommended promotion to Attorney III. (Id., ¶¶ 156-57).

### B. Cooper's Initial Complaints of Workplace Discrimination

Despite his successes at PHRC, Cooper paints a picture of a toxic culture at the agency, particularly under the leadership of JoAnn Edwards, who served as Executive Director of PHRC from 2011 until 2018.[2] (Doc. 1, ¶¶ 21, 75). At its root, Cooper's complaint contends that, as the only African American male attorney at the time of his hire, from 2014 through 2016 senior management staff subjected him to race-based harassment and disparate treatment compared to other Caucasian employees with similar tenure.

Between 2014 and 2016, the plaintiff alleges he was subject to race discrimination and a hostile work environment directed by Special Assistant Heather Roth and an employee Jinada Rochelle who he alleges was a close ally of the Harrisburg Regional Director, Ms. Roth. (Id., ¶¶ 38, 40, 45). He avers that he was required to attend meetings and trainings by Ms. Roth despite her not being in his

---

[2] The plaintiff's complaint avers that Ms. Edwards was fired in January 2018. Defendants admit that Ms. Edwards is no longer employed by the PHRC but deny the plaintiff's characterization of her departure from the agency.

6

chain of command, accused of being argumentative in meetings, subjected to hostility, chastisement, and criticism for mistakes made by others, told his work was sloppy, and ambushed in meetings. (Id., ¶¶ 46-54). In contrast, he claims even when his Caucasian co-worker, Mr. Zimmerman, forgot about a case on his docket for several months, he was simply reminded by email. (Id., ¶ 53). Despite an increasing workload, Cooper alleges he was told he was not working hard enough, and he had to attend regular counseling to deal with the stress and harassment at work. (Id., ¶¶ 58-59). Near the end of 2015 into the beginning of 2016, the situation came to a head. In an affidavit, ECS Director, Geoffrey Biringer, alleged that on or about December 2015 he and Ms. Roth's assistant, Tammy McElfresh had a conversation about the plaintiff's conduct in which McElfresh stated that Cooper was "talking to other Black employees of the PHRC about filing a complaint," and that "if the PHRC could prove it, they would fire him." (Doc. 1-2, at 13). Biringer acknowledged conveying this information to Cooper in an effort to protect him from discipline. (Id.)

### C. **Cooper Files a Discrimination Complaint with the EEOC in 2016.**

Shortly thereafter, on January 7, 2016, the plaintiff emailed the PHRC Commissioners and informed them of the alleged culture of discrimination at PHRC. (Doc. 1-2, at 15). According to Cooper, the commissioners took no action after his complaint, prompting him to file a complaint with the United States Equal

Employment Opportunity Commission ("EEOC") on February 2, 2016, alleging race and gender discrimination by PHRC. (Doc. 1-2, at 17).

### D. **Cooper Settles This 2016 Discrimination Complaint**

On May 8, 2017, the plaintiff entered an EEOC mediated pre-decisional settlement agreement with the defendant in which the PHRC agreed to establish a Diversity Committee with a vote introduced for its creation on or before June 26, 2017, and to not engage in discrimination or retaliation against the plaintiff because of the EEOC complaint or actions relating to the settlement. (Doc. 1-2, at 19). In exchange, the plaintiff agreed not to institute a lawsuit under Title VII based on the EEOC complaint. (Id.) Further, this agreement, which was also executed by a representative of the EEOC, provided that this agency would terminate its investigation of Cooper's charges based upon the parties' agreements and commitments. The settlement agreement also expressly provided that "the EEOC is authorized to investigate compliance with this Agreement, and to bring legal action to enforce the Settlement." (Id.) Thus, the agreement vested the EEOC with the authority to make determinations concerning breach of this agreement.

### E. **Cooper Complains About Compliance with this Settlement Agreement**.

Following this May 2017 settlement, Cooper alleges that, after two conference calls about the committee, his emails were disregarded, the commissioners did not participate in or advocate for regular Diversity Committee meetings, and several

diversity committee meetings were cancelled in 2017. (Doc. 1, ¶¶ 71, 74, 136). On June 12, 2017, the plaintiff emailed EEOC mediator Mr. Charles and informed him that PHRC was not complying with the agreement. (Doc. 1-2, at 22). He also emailed the commissioners on December 18, 2017 to request that they update him on whether they intended to maintain the diversity committee. (Id., at 23).

By the time of these events, PHRC management had changed. In May 2018, Ms. Edwards, who had been one of the principal subjects of Cooper's prior EEOC complaint, was replaced as Executive Director of PHRC by Chad Lassiter. (Doc. 1, ¶ 77). Cooper met with Lassiter to discuss the work of ECS and what Cooper characterized as the hostile history of PHRC. (Doc. 1, ¶ 107). He also informed him of the EEOC agreement, and that the diversity committee had not been formed. (Id., at ¶ 108). The plaintiff contends that Lassiter and the commissioners prioritized other commissions and initiatives over the diversity committee. (Id., at ¶¶ 110-120). On June 28, 2018, Cooper emailed Lassiter, provided him with the EEOC settlement agreement and let him know that, "[t]he [PHRC] has not upheld its terms of the agreement." (Doc. 1-2, at 24).

Subsequently, on February 8, 2019, PHRC scheduled its first diversity committee meeting. According to the plaintiff, the meeting lasted only about ten minutes, and Lassiter indicated PHRC had more important things to do than select a chairperson for the committee, although the defendant denies these averments. (Doc.

1, ¶ 130; Doc. 45-2, ¶ 130). The plaintiff also alleges that he notified Lassiter a week later that he was in breach of the settlement agreement and that he was going to contact the EEOC to enforce it. (Doc. 1, ¶ 131). Both parties admit that Lassiter indicated he was "not in breach of nothing." (Id.; Doc. 45-2, ¶ 131).

Cooper then reached out to PHRC Commissioner Bolstein requesting to speak with him regarding the committee, (Doc. 1-2, at 27), and the plaintiff alleges that Lassiter emailed him the following day, indicating that he should be included in such communications. (Doc. 1, ¶ 134). Commissioner Bolstein also responded, explaining that the diversity committee meetings had to be cancelled due to scheduling conflicts. (Doc. 1-2, at 28). Cooper also reached out to PHRC Commissioner Jones to schedule a call but alleges that he never received a reply. (Id., at 31). In February of 2019, the plaintiff alleges he also called Charles Phillips from the DOJ to request his help to mediate the Agreement with PHRC. (Doc. 1, at 24).

The instant case culminated on February 20, 2019, when the plaintiff sent an email to several community members[3] requesting the help and support of the

---

[3] The parties dispute the connection between the February 20th email recipients and the PHRC. The plaintiff asserts that the email was sent to four PHRC commissioners, members of PHRC advisory councils, NAACP members, the Philadelphia Human Relations Commission, diversity trainers, and other civil rights leaders associated with PHRC. (Doc. 51, at 18 n.11). The defendants allege the majority of the individuals who received the email had no connection to the PHRC. (Doc. 48, at 23).

recipients in forming a comprehensive diversity committee and plan at the PHRC. (Doc. 1-2, at 50). It mentioned past discrimination actions against the PHRC, though did not specifically reference the settlement agreement. (Id.) The email also indicated that Cooper had been trying to institute a committee for years and had received push-back from Executive Director Lassiter and Chairman Bolstein. (Id.) Finally, the email stated that "[o]ur lack of leadership prevents PHRC from properly addressing discrimination in our state," and requested that the recipients respond with messages of support, "and/or forward this email to at least five people: your state reps, local politicians, and community leaders, etc." (Id.)

On February 23, 2019, Mr. Lassiter sent the plaintiff an email regarding his February 20th email to community members. (Doc. 1-2, at 52).  The email defended the initiatives of the PHRC and its diversity. (Id.) It did not directly address the EEOC settlement agreement or diversity committee, with the exception of stating that the PHRC "will continue to respect everyone and honor all agreements including the diversity one." (Id.) Mr. Lassiter informed Cooper that he is not "more powerful than God" and warned that "Mr. Cooper needs to be very careful with the narratives that he and those who are colliding [sic] with him are putting out with regards to his claims that 'there are no Civil Rights people around me.'" (Id.) He closed with, "I'm not afraid of anyone but God and I am asking Mr. Cooper to get the help he needs." (Id.) The record also shows that, after receiving the email from Mr. Lassiter, the

plaintiff referred to Mr. Lassiter in follow-up emails as "unhinged" and called the PHRC a "mini-mafia." (Doc. 46, ¶ 9; Doc. 46-1, at 155, 158).

Following this exchange, on March 1, 2019, Cooper emailed and mailed a letter to John Waldinger, Newark Area Director of the EEOC, informing him that PHRC had not complied with the settlement agreement and requesting that PHRC return to conduct another mediation or that the case investigation be reopened. (Doc. 1-2, at 32). The record does not reflect the outcome of the March 1st letter.

**F. Cooper is the Subject of an E-mail Abuse Inquiry by the PHRC.**

On March 25, 2019 the plaintiff was asked to meet with Chief Employee Relations Matthew Updegrove regarding the February 20th email. (Doc. 1 ¶ 145-46). The plaintiff alleges Mr. Updegrove asked if he believed the email made PHRC look bad. (Id.) He also asked about several other emails the plaintiff had sent from his work email, including one email including a picture of a model sent to her personal email address, claiming it was "sexually suggestive." (Id., ¶¶ 146, 149). Cooper explained that everything in the February 20th email was factual and that PHRC had not complied with the settlement agreement. (Id.) He later sent him a full narrative documenting his experiences at PHRC and the allegedly hostile treatment he received. (Id., ¶ 150; Doc 1-2, at 33).

## G. **Cooper Files a Retaliation Complaint with the EEOC and is Fired.**

On April 1, 2019, Cooper filed a retaliation complaint with the EEOC.[4] (Doc. 60, at 12). He was terminated from PHRC on April 9, 2019. (Doc. 1, ¶ 152).[5] He also filed another complaint for race discrimination on July 11, 2019, asserting the same factual allegations as his settled 2016 complaint, but including additional actions taken in March 2019 by Ms. Roth. (Doc. 60, at 5). A right to sue letter for Cooper's retaliation claim was issued by the EEOC on October 1, 2019. (Id., at 9).

It is against the factual background this robust and long-running workplace acrimony that we view the plaintiff's claims of hostile work environment and retaliation under Title VII, as well as his Pennsylvania Whistleblower claim. Cooper filed his complaint in federal court on December 30th, 2019. (Doc. 1). After being granted an extension of time to file a responsive pleading, (Doc. 10), the defendant filed an answer on April 29, 2020. (Doc. 16). Following an extension of the discovery period, the instant motion for summary judgment was filed by the

---

[4] There have been a variety of dates introduced into the record as to when exactly the three separate EEOC complaints were filed and when the EEOC action "began." The date referenced here is from a summary of the EEOC cases provided by the plaintiff upon request by the court. (Doc. 60, at 11). Since there is no statute of limitations issue raised as to the retaliation complaint, there is no need for the court to belabor this date discrepancy further.

[5] Apparently, the retaliation complaint filed on April 1 alleged only that the interrogation interview and search of his computer emails was retaliatory, however he later added the termination to his complaint. (Doc. 60, at 12).

defendant on March 1st, 2021.[6] (Doc. 28). The motion is fully briefed and is ripe for disposition. (Docs. 28, 46, 48, 51, 55, 56, 60). After a review of the record, we find that there still exists a question of fact for the jury as to the plaintiff's retaliation claim under Title VII. We also find that no genuine issue of material fact remains, and the defendant is entitled to judgment on the plaintiff's claims for hostile work environment under Title VII and his Pennsylvania Whistleblower claim. Accordingly, the defendant's motion for summary judgment shall be granted in part and denied in part.

## II.   <u>Discussion</u>

### A. <u>Motion for Summary Judgment – Standard of Review</u>

The defendant has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, which provides that the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Through summary adjudication, a court is empowered to dispose of those claims that

---

[6] In his response brief to the defendant's motion for summary judgment, the plaintiff argues that the defendant's motion for summary judgment is untimely. After a thorough review of the docket, we simply note that all motions and briefs filed after preliminary deadlines were done so on motion and with leave of the court. The plaintiff's contention that defendant somehow took advantage of the COVID-19 pandemic to run up plaintiff's attorney's fees is frivolous and without merit. If the plaintiff took issue with the extensions granted by this court, his objections were most suitably asserted on motion prior to the court's issuance of orders. Accordingly, the plaintiff's argument that the motion for summary judgment is untimely fails.

do not present a "genuine dispute as to any material fact," Fed. R. Civ. P. 56(a), and for which a trial would be "an empty and unnecessary formality." Univac Dental Co. v. Dentsply Int'l, Inc., 702 F.Supp.2d 465, 468 (M.D. Pa. 2010). The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. Id., at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006), accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Summary judgment is also

appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence. <u>Anderson</u>, 477 U.S. at 249. There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts. <u>Id.</u> at 252; <u>see also</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." <u>A.W. v. Jersey City Pub. Schs.</u>, 486 F.3d 791, 794 (3d Cir. 2007).

Moreover, a party who seeks to resist a summary judgment motion by citing to disputed material issues of fact must show by competent evidence that such factual disputes exist. Further, "only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment." <u>Countryside Oil Co., Inc. v. Travelers Ins. Co.</u>, 928 F. Supp. 474, 482 (D.N.J. 1995). Similarly, it is well-settled that: "[o]ne cannot create an issue of fact merely by . . . denying averments . . . without producing any supporting evidence of the denials." <u>Thimons v. PNC Bank, NA</u>, 254 F. App'x 896, 899 (3d Cir. 2007) (citation omitted). Thus, "[w]hen a motion for summary judgment is made and supported . . ., an adverse party may not rest upon mere allegations or denial." <u>Fireman's Ins. Co. of Newark New Jersey v. DuFresne</u>, 676 F.2d 965, 968 (3d Cir. 1982); <u>see also</u> <u>Sunshine Books, Ltd. v. Temple University</u>, 697 F.2d 90, 96 (3d Cir. 1982). "[A] mere denial is insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the veracity of the opposing affidavit

is also not sufficient." Lockhart v. Hoenstine, 411 F.2d 455, 458 (3d Cir. 1969).

Furthermore, "a party resisting a [Rule 56] motion cannot expect to rely merely upon

bare assertions, conclusory allegations or suspicions." Gans v. Mundy, 762 F.2d 338,

341 (3d Cir. 1985) (citing Ness v. Marshall, 660 F.2d 517, 519 (3d Cir. 1981)).

Finally, it is emphatically not the province of the court to weigh evidence or

assess credibility when passing upon a motion for summary judgment. Rather, in

adjudicating the motion, the court must view the evidence presented in the light most

favorable to the opposing party, Anderson, 477 U.S. at 255, and draw all reasonable

inferences in the light most favorable to the non-moving party. Big Apple BMW,

Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992). Where

the non-moving party's evidence contradicts the movant's, then the non-movant's

must be taken as true. Id. Additionally, the court is not to decide whether the

evidence unquestionably favors one side or the other, or to make credibility

determinations, but instead must decide whether a fair-minded jury could return a

verdict for the plaintiff on the evidence presented. Anderson, 477 U.S. at 252; see

also Big Apple BMW, 974 F.2d at 1363. In reaching this determination, the Third

Circuit has instructed that:

> To raise a genuine issue of material fact . . . the opponent need not
> match, item for item, each piece of evidence proffered by the movant.
> In practical terms, if the opponent has exceeded the "mere scintilla"
> threshold and has offered a genuine issue of material fact, then the court
> cannot credit the movant's version of events against the opponent, even
> if the quantity of the movant's evidence far outweighs that of its

> opponent. It thus remains the province of the fact finder to ascertain the believability and weight of the evidence.

Id. In contrast, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotation marks omitted); NAACP v. North Hudson Reg'l Fire & Rescue, 665 F.3d 464, 476 (3d Cir. 2011).

## B. **The Defendant's Motion Should Be Granted in Part and Denied in Part.**

The defendant has moved for summary judgment, alleging first that the plaintiff's Title VII claims for discrimination, hostile work environment and retaliation all fail as a matter of law. Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against and/or discharging their employees because of their race. 42 U.S.C. § 2000e-2(a)(1). Title VII discrimination claims are governed by a burden-shifting framework. See Jones v. Southeastern Pa. Transp. Auth., 796 F.3d 323, 325-26 (3d Cir. 2015). In brief, that framework requires that the plaintiff demonstrate that (1) he is a member of a protected class, (2) he suffered an adverse employment action, (3) under circumstances that give rise to an inference of unlawful race-based discrimination. Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003). The last element also requires that the plaintiff demonstrate a causal connection between his protected status and the allegedly adverse

18

action. Id. at 798. The key focus of the *prima facie* test is "always whether the employer is treating 'some people less favorably than others because of their race, color, religion, sex, or national origin.'" Id. (citation omitted). The elements of the *prima facie* case "must not be applied woodenly but must rather be tailored flexibly to fit the circumstances of each type of illegal discrimination." Geraci v. Moody-Tottrup Int'l, Inc., 82 F.3d 578, 581 (3d Cir. 1996).

Plaintiffs like Cooper must also satisfy Title VII's administrative exhaustion requirements as a prerequisite to bringing suit. That administrative exhaustion requirement limits plaintiffs to the litigation of those claims which they properly presented and exhausted before the administrative agency. As the Court of Appeals has explained:

> A plaintiff bringing an employment discrimination claim under Title VII must comply with the procedural requirements set forth in 42 U.S.C. § 2000e–5. Before filing a lawsuit, a plaintiff must exhaust her administrative remedies by filing a timely discrimination charge with the EEOC. Id. §§ 2000e–5(b), (e)(1), (f)(1). The EEOC will then investigate the charge, and the plaintiff must wait until the EEOC issues a right-to-sue letter before she can initiate a private action. Burgh v. Borough Council, 251 F.3d 465, 470 (3d Cir. 2001). The ensuing suit is limited to claims that are within the scope of the initial administrative charge. Antol v. Perry, 82 F.3d 1291, 1296 (3d Cir. 1996). "The purpose of requiring exhaustion is to afford the EEOC the opportunity to settle disputes through conference, conciliation, and persuasion, avoiding unnecessary action in court." Id. After a charge is filed, "the scope of a resulting private civil action in the district court is 'defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination....'" Hicks v. ABT Assoc., Inc., 572 F.2d 960, 966 (3d Cir. 1978) (quoting Ostapowicz v. Johnson Bronze Co., 541 F.2d 394, 398–99 (3d Cir. 1976) ); see

also Antol, 82 F.3d at 1295; Waiters v. Parsons, 729 F.2d 233, 237 (3d Cir. 1984).

Barzanty v. Verizon PA, Inc., 361 F. App'x 411, 413–14 (3d Cir. 2010).

On occasion, employers have sought to dismiss hostile workplace claims like those advanced here by Cooper, arguing that these claims were not properly presented to the administrative agency. Courts have adopted a pragmatic approach to the resolution of such exhaustion claims. Thus, courts eschew reliance upon any particular terms of art to state a hostile workplace claim. For example, "[i]n Anjelino v. New York Times Co., 200 F.3d 73, 94–95 (3d Cir. 1999), [it was] held [that] a hostile work environment claim was within the scope of an initial EEOC charge because it alleged the plaintiff was subjected to an 'abusive atmosphere,' a phrase which is interchangeable with 'hostile work environment.'" Barzanty, 361 F. App'x at 414. Thus, a worker need not use any particular magic words to state such a claim at the administrative level, and the administrative complaint should be construed as a whole in a common-sense fashion. Adopting this approach to exhaustion issues, what is often deemed crucial in assessing whether an administrative complaint described a hostile work environment is whether the administrative claim "provided notice to the EEOC that the termination arose from ongoing issues." Lowenstein v. Catholic Health E., 820 F. Supp. 2d 639, 645 (E.D. Pa. 2011).

It is against these legal benchmarks that we assess Cooper's hostile work environment, and retaliation claims.

### 1.  <u>Title VII Hostile Work Environment Discrimination Claim</u>

The defendant's motion for summary judgment asserts a number of procedural hurdles to this hostile work environment claim, arguing the plaintiff's hostile work environment claim fails because he failed to include it in his original EEOC filing, the claim violated the statute of limitations, and the PHRC previously settled this claim with the EEOC.

The defendant's arguments that the hostile work environment claim violates the statute of limitations, was previously settled, and is outside the scope of the original discrimination charge all implicate the plaintiff's race discrimination complaint that was settled in 2017. As the defendant points out, much of the plaintiff's instant complaint cites instances of alleged discrimination between 2014 and 2016. The plaintiff also admits that his 2019 EEOC race discrimination complaint incorporated the events from this period. The defendant argues that the hostile work environment claim was both already settled, and outside the scope of the original complaint.

To the extent that the hostile work environment claim is outside the scope of the original complaint, as the defendant points out, "[t]he purpose of requiring exhaustion is to afford the EEOC the opportunity to settle disputes through conference, conciliation, and persuasion, avoiding unnecessary action in court." <u>Antol v. Perry</u>, 82 F.3d 1291, 1296 (3d Cir. 1996). On this score, "[t]he relevant test

in determining whether appellant was required to exhaust her administrative remedies . . . is whether the acts alleged in the subsequent Title VII suit are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom." Id. (citing Waiters v. Parsons, 729 F.2d 233, 237 (3d Cir. 1984)).

The plaintiff argues that a reasonable jury could find that PHRC subjected him to a racist and hostile working environment violating Title VII *until he was terminated* on April 9, 2019. His complaint includes incidents occurring after the settlement agreement but fails to account for how they are "sufficiently related" to any of the previous alleged acts of hostility based on race. Although the plaintiff has alleged certain instances of animus based on race from his interactions with the previous executive director and Ms. Roth stretching back to 2016, he has failed to make the connection between those incidents and his contentious relationship with Executive Director Lassiter, which  occurred in 2018 and 2019 years after the settlement agreement. As the defendant points out, Mr. Lassiter was not employed by PHRC at the time of the settlement agreement and thus had no connection to the previous claims of discrimination. Thus, there is little temporal or topical connection between the events of 2014 through 2016 which took place during Ms. Roth's tenure,

and Cooper's dissatisfaction with the alleged inaction of Mr. Lassiter in 2018 and 2019.[7]

More fundamentally, to the extent that Cooper wishes to resurrect these matters from 2014 through 2016 and conflate them into a sweeping hostile workplace discrimination claim, he has not taken the necessary legal steps required to revive these claims which were settled in an EEOC pre-decisional settlement agreement. To the extent that the plaintiff asks this court to relitigate instances of race discrimination that were settled in this fashion before the EEOC, we are unable to do so. The plaintiff appears to assert that he is entitled to reinitiate his claim due to an alleged breach of the settlement agreement, however, according to its regulations, the EEOC has sole discretion to enforce the terms of its settlement agreements:

> Any settlement agreement knowingly and voluntarily agreed to by the parties, reached at any stage of the complaint process, shall be binding on both parties. Final action that has not been the subject of an appeal

---

[7] Cooper attempts to bridge the gulf between these disparate events engaged in by different actors over the span of many years by arguing that it was specifically his relationship with Ms. Roth that initially resulted in an ongoing hostile environment in 2014, asserting that, in 2017, Ms. Roth harassed him by taking away his work responsibilities and contending that in 2019 Ms. Roth sent a letter stating the plaintiff should be fired, (Doc. 51, at 14). He also cites to other complaints of discrimination and harassment by other employees unrelated to his claim. These discrete incidents do not amount to severe, pervasive, and intentional harassment based on his race and thus he has not shown that this allegedly hostile work environment based on race discrimination was ongoing.

or civil action shall be binding on the agency. If the complainant believes that the agency has failed to comply with the terms of a settlement agreement or decision, the complainant shall notify the EEO Director, in writing, of the alleged noncompliance within 30 days of when the complainant knew or should have known of the alleged noncompliance. The complainant may request that the terms of settlement agreement be specifically implemented or, alternatively, that the complaint be reinstated for further processing from the point processing ceased.

29 C.F.R. § 1614.504(a).

Moreover, the settlement agreement itself provided that "the EEOC is authorized to investigate compliance with this Agreement, and to bring legal action to enforce the Settlement." (Doc. 1-2 at 19). Thus, the agreement vested the EEOC with the exclusive authority to make determinations concerning breach of this agreement.

As we read Cooper's hostile workplace discrimination claim, an integral part of that claim involves instances of alleged discrimination that he admits were the subject of the EEOC settlement agreement. However, under the terms of the settlement agreement, Cooper agreed not to institute a lawsuit under Title VII based on the same allegations in his 2016 complaint unless and until he complied with the applicable agency procedures. (Doc. 46-3, at 2). Moreover, the determination of whether a breach of this agreement has occurred must be made by the EEOC in the first instance. Additionally, "even when a party alleges a breach of a voluntary settlement agreement, she is precluded from reviving the underlying Title VII claim

24

in federal court," and the "remedy for the alleged subsequent breach is confined to her cause of action for breach of the Settlement." Sherman v. Standard Rate Data Serv., Inc., 709 F. Supp. 1433, 1438 (N.D. Ill. 1989) (citing Vermett v. Hough, 606 F.Supp. 732, 745–46 (W.D.Mich.1984)).

Indeed, case law has long recognized the importance of deferring to the EEOC when it comes to enforcement and interpretation of that agency's pre-decisional settlement agreements. Therefore, federal courts have rebuffed invitations to entertain claims to enforce EEOC settlement agreements, holding instead that the courts lack jurisdiction over such claims in light of the regulatory process prescribed for agency review of these issues. Munoz v. Mabus, 630 F.3d 856, 861 (9th Cir. 2010) citing Lindstrom v. United States, 510 F.3d 1191, 1195 (10th Cir.2007); Frahm v. United States, 492 F.3d 258, 262 (4th Cir.2007)

In the instant case, a necessary prerequisite to Cooper's discrimination claim in its current form would be a finding that the PHRC has violated the terms of the pre-decisional settlement agreement. As a legal matter that finding must be made in the first instance by the EEOC and we cannot substitute our judgment for that of the agency which brokered and oversees this agreement. While it appears that the plaintiff did inform John Waldinger, Newark Area Director of the EEOC, of the defendant's alleged noncompliance with this agreement in March of 2019, the outcome of that communication is unclear from the record, and this initial

communication cannot be deemed to be full compliance with the agency's procedures for enforcing settlement agreements. (Doc. 1-2, at 32). Therefore, to the extent that Cooper seeks to reinstate these settled claims in the instant case without first exhausting his remedies with the EEOC, we find that he is procedurally barred from doing so.

For his part, the plaintiff attempts to avoid this procedural requirement by arguing that he is entitled to bring his previously settled discrimination claim under Title VII without first exhausting his clearly defined agency remedies due to equitable tolling, because the defendant actively misled the plaintiff from pursuing litigation by entering into a settlement agreement it did not intend to honor.

There are two problems with this assertion as grounds for by-passing the agency process prescribed by law. First, as we noted, "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions," Gans, 762 F.2d at 341, and, beyond his conclusory assertions and suspicions, Cooper simply has not shown as a matter of fact that the PHRC entered into this agreement in bad faith. Moreover, and more fundamentally, whether the PHRC's actions were sufficient under the agreement is, again, a question to be raised with the EEOC and not within the purview of this court.  Since the plaintiff relies upon "merely colorable, conclusory, or speculative evidence," Anderson, 477 U.S.

at 249, to support his argument that he is entitled to pursue his claim under the doctrine of equitable tolling, this argument also fails.[8]

Once these temporally remote and previously settled matters are excised from the plaintiff's complaint, Cooper remaining allegations sound in retaliation but do not reach the level of a hostile workplace claim. In order to make a *prima facie* claim of race-based discrimination on the basis of a hostile work environment, a plaintiff must show that (1) he suffered intentional harassment based on his race; (2) the harassment was severe or pervasive; (3) the harassment detrimentally affected him; (4) the harassment would have detrimentally affected a reasonable person in similar circumstances; and (5) a basis for employer liability. 42 U.S.C. § 2000e-2(a); Huston v. Procter & Gamble Paper Prods. Corp., 568 F.3d 100, 104 (3d Cir. 2009); Lawrence v. F.C. Kerbeck & Sons, 134 F. App'x 570, 571 (3d Cir. 2005) (citing Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1081 (3d Cir. 1996) ); Taylor v. JFC Staffing Assocs., 690 F. Supp. 357 (M.D. Pa. 2009). The last factor requires that the plaintiff point to facts showing that the employer was aware of the

---

[8] While we find that this argument fails because the issue of compliance with the EEOC's settlement agreement is consigned by law to the EEOC in the first instance, we note that in its response to Cooper's argument, the PHRC has implied that nothing in its settlement agreement required it to establish what Cooper would have regarded as a "functioning" diversity committee. (Doc. 48 at 16 n. 3). Given the PHRC's role in enforcing the civil rights of workers under state law, it may well wish to reconsider the extent to which it would pursue this line of argument when, and if, there are EEOC proceedings regarding the proper construction of the settlement agreement.

discrimination and yet failed to take prompt and appropriate corrective action. Syed v. YWCA of Hanover, 906 F.Supp.2d 345, 358 (M.D. Pa. 2012).

Isolated comments and insensitive remarks or unpleasant utterances may not sufficiently affect the conditions of employment in a manner severe enough to implicate Title VII, as Title VII is not a "generalized 'civility code.'" Jensen v. Potter, 435 F.3d 444, 452 (3d Cir. 2006) (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998)). Rather, the statute "prohibits severe or pervasive harassment; it does not mandate a happy workplace. Occasional insults, teasing, or episodic instances of ridicule are not enough [because] they do not 'permeate' the workplace and change the very nature of the plaintiff's employment." Id. at 451. Factors to be considered include the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. Id. (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)). No single factor is dispositive, and the analysis focuses on the totality of the circumstances. Id. (citing Andrews v. City of Phila., 895 F.2d 1469, 1482 (3d Cir.1990)).

Based on a thorough review of the record, we find that the evidence adduced by the plaintiff relating to actions taken by the PHRC after the parties entered into their settlement agreement colorably supports a retaliation claim but does not sustain

a claim that the plaintiff was subjected to intentional, pervasive, and severe harassment based on race. As the defendant point out, the plaintiff casts a wide net in his complaint, but nonetheless comes up short of the requisite showing under the Title VII hostile work environment standard once the remote matters which were the subject of a prior settlement that has not been set aside are excluded from our consideration. Undoubtedly Cooper's relationship with Mr. Lassiter, and perhaps other coworkers, was rife with animosity after 2017, but Cooper has not shown that such animosity, particularly after the settlement agreement, was based on his membership in a protected class. As we previously pointed out, "the statute 'prohibits severe or pervasive harassment; it does not mandate a happy workplace.'" Jensen, 435 F.3d at 451. The disparate evidentiary threads which Cooper attempts to stitch together to sustain this claim are simply insufficient to establish a hostile workplace claim. Indeed, once the unexhausted matters are set aside, this claim rests on little more than isolated comments, the racial disparity between Cooper and other staff, and the fact that the PHRC has been sued by other persons in other contexts for allegedly discriminatory conduct. However, this proof falls well short of the type of pervasive, racially rooted hostility specifically targeting the plaintiff that the law forbids. Thus, given these procedural and substantive hurdles, the plaintiff's hostile workplace claim fails, as it is currently pleaded, and the defendant is entitled to summary judgment on this claim.

29

### 2. <u>Title VII Retaliation Claim</u>

On the other hand, as to the plaintiff's retaliation claim, drawing all reasonable inferences in favor of the nonmoving party, the plaintiff, we find there exists a question of material fact for the jury. To make out a *prima facie* case of retaliation under Title VII, a plaintiff must show (1) that he engaged in protected activity; (2) that he suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse action. <u>Carvalho-Grevious v. Delaware State Univ.</u>, 851 F.3d 249, 257 (3d Cir. 2017). Ultimately, a plaintiff bringing a Title VII retaliation claim must be able to show that his participation in protected activity was the but-for cause of any alleged adverse employment action that he suffered. <u>Univ. of Tex. Southwestern Med. Ctr. v. Nassar</u>, 570 U.S. 338 (2013) ("Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e-2(m). This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer"); <u>see also</u> <u>Grevious</u>, 851 F.3d at 257 (noting that a plaintiff alleging Title VII retaliation "has a higher causal burden than a plaintiff asserting a claim of direct status-based discrimination under Title VII"). "The ultimate question in any retaliation case is an intent to retaliate vel non." <u>Jensen</u>, 435 F.3d at 449 n.2.

As we have noted, Title VII claims are subject to the McDonnell Douglas burden-shifting framework. Thus, if the employee establishes a *prima facie* case of discrimination or retaliation based upon race, the burden shifts to the employer to advance a legitimate, non-discriminatory and non-retaliatory reason for its conduct, and if the employer does so "the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that [discrimination or] retaliation was the real reason for the adverse employment action." Moore v. City of Phila., 461 F.3d 331, 342 (3d Cir. 2006) (quoting Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500-01 (3d Cir. 1997)). Further, "[t]he Supreme Court has recently clarified that, as to the third prong, a plaintiff making a claim of retaliation under Title VII "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." Verma v. Univ. of Pennsylvania, 533 F. App'x 115, 119 (3d Cir. 2013) (citing Nassar, 133 S.Ct. at 2534).

The defendant concedes that the plaintiff has met the first two prongs–the plaintiff engaged in a protected activity and suffered an adverse employment action –but avers that the plaintiff cannot prove causation between the two. Both the plaintiff and the defendant agree that the plaintiff was fired from PHRC, at least in part, because of an email he sent on February 20, 2019 regarding the alleged failure of the PHRC to abide by the terms of the 2017 EEOC settlement agreement. The

plaintiff lays out his *prima facie* case of retaliation as follows: he engaged in a protected activity when he advocated for the enforcement of the EEOC settlement agreement; he was subjected to an adverse employment action when he was fired due to the email advocating for the enforcement of the settlement agreement; PHRC admits that it terminated him because of the email and Mr. Lassiter's own words and actions show that he intended to seek revenge against the plaintiff, including his statement that he thought the email "was a hit job on the PHRC."

According to the defendant, the plaintiff was fired for multiple IT violations, including the February 20, 2019 email and other subsequent emails in which the plaintiff referred to the executive director as "unhinged" and the PHRC as a "mini-mafia." They also allege he was terminated for sending an inappropriate picture to his personal email address from his Commonwealth email address. The termination letter, (Doc. 1-2, at 55), notably makes no mention of the February 20th email regarding the settlement agreement and mentions only the plaintiff's comments of Lassiter being "unhinged" and the PHRC being a "mini mafia" and the inappropriate photo.

Thus, with respect to Cooper's retaliation claim, there is some agreement as to the chronology of events, and a starkly defined dispute concerning the motives of the parties. In the summary judgment context, this is highly significant since it is well-settled that: "The motive or absence of motive of a party to engage in conduct

alleged by another party is relevant to determining whether a genuine issue of fact exists." Berda v. CBS Inc., 800 F.Supp. 1272, 1276 (W. D. Pa), aff'd., 975 F.2d 1548 (3d Cir. 1992) citing Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 596 (1986).

In our view, there exists a question for the jury as to the intent behind the firing and whether it was in retaliation for the plaintiff's pursuance of the terms of the settlement agreement. The defendants first allege that Lassiter's actions could not be in retaliation for the plaintiff's insistence on enforcing the settlement agreement, since he was not employed by the PHRC at the time of the plaintiff's original action. We do not find this argument to be dispositive. While it is true that Lassiter was not the executive director of PHRC at the time of the settlement, the plaintiff argues he was fired for speaking out against the ongoing failure of PHRC to comply with the agreement during Lassiter's employ. The fact that Lassiter was not involved in the formation of the settlement agreement does not foreclose the possibility that he retaliated for Cooper's insistence on enforcing the agreement during his time as the executive director.

Further, although, as the defendant points out, the plaintiff must ultimately prove that the protected activity was a but-for cause of the adverse action by the employer, we disagree that this is determinative at the summary judgement stage. As the plaintiff points out, "a plaintiff alleging retaliation has a lesser causal burden

at the prima facie stage," where he must only "produce evidence 'sufficient to raise the inference that her protected activity was the *likely reason* for the adverse [employment] action." <u>Grevious</u>, 851 F.3d at 259 (citing <u>Doe v. C.A.R.S. Prot. Plus, Inc.</u>, 527 F.3d 358, 365 (3d Cir. 2008); <u>Kachmar v. SunGard Data Systems, Inc.</u>, 109 F.3d 173, 177 (3d Cir. 1997)). On this score, the plaintiff has presented evidence that Lassiter had become irritated about the settlement agreement and diversity committee, including his statement that he "ain't in breach of nothing," his indication that the PHRC had "more important things to do" at the first diversity committee meeting, and in particular his response to the February 20th email in which he accused the plaintiff of attempting to "tear down" the commission and that "Mr. Cooper needs to be very careful with the narratives that he and those who are colliding [sic] with him are putting out."

Moreover, the Third Circuit "has 'indicated that temporal proximity between the employee's protected activity and the alleged retaliatory action may satisfy the causal link element of a prima facie retaliation claim, at least where the timing is unusually suggestive of retaliatory motive.'" <u>Verma</u>, 533 F. App'x at 119 (quoting <u>Shaner v. Synthes</u>, 204 F.3d 494, 505 (3d Cir.2000)). Given the proximity between the February 20th email, Lassiter's response email three days later, and the subsequent search of the plaintiff's email, as well as the closely coincidental timing of Cooper's April 1 EEOC retaliation complaint and his April 9 termination, a

reasonable jury could find that the reasoning cited by the PHRC for Cooper's firing, including the inappropriate picture, were mere pretext for the retaliation.

We reach our conclusion on this motion in light of our mandate that, on a motion for summary judgment we are to consider all the evidence in the light most favorable to the party opposing the motion, <u>Anderson</u>, 477 U.S. at 255, drawing all reasonable inferences in his favor, and taking non-movant's evidence as true when there exists a conflict. <u>Big Apple BMW, Inc.</u>, 974 F.2d at 1363. Given this standard, and in light of the conflicting accounts of the intentions behind Cooper's termination, we hold that a reasonable trier of fact could find in favor of the plaintiff on his retaliation claim. Thus, summary judgment as to this claim should be denied.

### 3.  **PA Whistleblower Claim**

Finally, the defendants have moved for summary judgment on the plaintiff's Pennsylvania Whistleblower claim, asserting that his claim is both barred by the statute of limitations, and fails as a matter of law.

The Pennsylvania Whistleblower Law, 43 Pa. Cons. Stat. § 1421 *et seq.*, states in relevant part:

> No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste.

43 Pa. Cons. Stat. § 1423(a). Thus, an employee who makes a good faith report of waste or wrongdoing, good faith meaning "without malice or consideration of personal benefit" and about which the employee believes is true, cannot be discriminated against or retaliated against by her employer. 43 Pa. Cons. Stat. § 1422. The law defines "wrongdoing" as a violation of a state or federal statute or regulation "which is not of a merely technical or minimal nature." Id. "Waste" is defined as "[a]n employer's conduct or omissions which result in substantial abuse, misuse, destruction or loss of funds or resources belong to or derived from Commonwealth or political subdivision sources." Id. Additionally, and notably for our purposes, a plaintiff who brings a claim under this statute must file the action within 180 days after the occurrence of the alleged violation. 43 Pa. Cons. Stat. § 1424(a).

To establish a *prime facie* case under the Pennsylvania Whistleblower Law, a plaintiff must prove "by preponderance of the evidence, that, prior to the alleged acts of retaliation, [s]he had made a good faith report of wrongdoing to appropriate authorities." Kimes v. Univ. of Scranton, 126 F.Supp.3d 477, 505 (M.D. Pa. 2015) (quoting O'Rourke v. Commonwealth, 778 A.2d 1194, 1200 (Pa. 2001) (internal quotations omitted)). The plaintiff must also present evidence of a causal connection between the report she made and the alleged acts of retaliation. Golaschevsky v. Dep't of Envtl. Prot., 720 A.2d 757, 759-60 (Pa. 1998). If the plaintiff can set forth

a *prima facie* case of retaliation, "the burden shifts to the employer to show its actions were lawful." <u>Johnson v. Res. for Human Dev., Inc.</u>, 789 F.Supp.2d 595, 601 (E.D. Pa. 2011) (citing <u>O'Rourke</u>, 778 A.2d at 1200). If the employer can demonstrate that the action taken "occurred for separate and legitimate reasons, which are not merely pretextual," the employer will not be held liable. 43 Pa. Cons. Stat. § 1424(c); <u>Johnson</u>, 789 F.Supp.2d at 601.

In the instant case, the defendant argues that Cooper's whistleblower claim fails under the Pennsylvania Whistleblower Law because any claim under this statute is barred by the statute of limitations. We agree. The alleged retaliation, or Cooper's termination from PHRC, occurred on April 9, 2019. Under the 180-day statute of limitations imposed by the Pennsylvania Whistleblower Law, he was required to file his complaint by October 6th, 2019. Cooper filed his complaint on December 30th, 2019. Thus, his complaint is time-barred under the Pennsylvania Whistleblower Law, as he did not bring his claim within 180 days of the adverse action.

Further, Cooper's argument that his claim should have been equitably tolled until he exhausted his administrative rights fails. The plaintiff's filing of a claim with the EEOC does not toll the statute of limitations under the Pennsylvania Whistleblower Law. <u>See</u> <u>Plemmons v. Pennsylvania Mfrs. Ass'n Ins. Co.</u>, 1991 WL 61128, at *2 (E.D. Pa. Apr. 13, 1991) (holding that the filing of

a complaint with the EEOC is not sufficient to satisfy the Pennsylvania Whistleblower Law's 180-day statute of limitations); see also N'Jai v. Floyd, 2009 WL 4823839, at *20 (W.D. Pa. Dec. 9, 2009) aff'd, 386 F. App'x 141 (3d Cir. 2010) (noting that because Pennsylvania's Whistleblower Law is not subject to exhaustion through the PHRC, the filing of a complaint with the PHRC is not sufficient to toll the Pennsylvania Whistleblower Law's 180-day statute of limitations). Therefore, Cooper may not rely upon a tolling argument based upon EEOC filing to avoid the bar of the statute of limitations in this case. Accordingly, the defendant's motion should be granted as to the plaintiff's whistleblower claim to the extent he seeks to bring this claim under the Pennsylvania Whistleblower Law.

## III.   **Conclusion**

Accordingly, for the foregoing reasons, the defendant's motion for summary judgment (Doc. 28) will be DENIED as to the claim of retaliation under Title VII and GRANTED as to the plaintiff's claim of hostile work environment under Title VII and his Pennsylvania Whistleblower claim.

An appropriate order follows.

*S/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

Dated: January 5, 2022